IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **DON WAYNE CURTIS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.   3:15-CV-00225-L-BH** |
| | § | |
| **CAROLYN COLVIN, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3-251*, this case has been referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Brief on Review of the Social Security Administration's Denial of Benefits*, filed April 29, 2015 (doc. 12) and *Defendant's Brief*, filed May 29, 2015 (doc. 13).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.   BACKGROUND

### A.   Procedural History

Don Wayne Curtis (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act.[2]  On January 16, 2012, Plaintiff applied for DIB, alleging disability beginning on November 22, 2009, due to asthma, arthritis, back injury, hearing loss, neck injury, headaches, hand injury, and knee injury.  (R. at 313.)  His application was denied initially

---

[2]  The background information is summarized from the record of the administrative proceedings, which is designated as "R."

and upon reconsideration.  (R. at 151-154, 157-159.)  Plaintiff requested a hearing before an

Administrative Law Judge (ALJ), and he personally appeared and testified at a hearing held on

November 5, 2012. (R. at 39-86, 160.)  On April 12, 2013, the ALJ issued his decision finding

Plaintiff not disabled.  (R. at 135-142.)  Plaintiff requested review of the ALJ's decision, and the

Appeals Council granted his request for review.  (R. at 361-363,147-48.)  It vacated the hearing

decision and remanded the case to the ALJ for his evaluation of new records submitted by Plaintiff

and for further consideration of Plaintiff's past relevant work at step four of the sequential evaluation

process.  (R. at 147.)  Plaintiff then appeared and testified at another hearing held on April 22, 2014.

(R. at 88-129.)  On July 14, 2014, the ALJ issued his second decision finding Plaintiff not disabled.

(R. at 15-33.)  Plaintiff requested review of the ALJ's second decision, and the Appeals Council

denied his request for review on November 24, 2014, making the ALJ's second decision the final

decision of the Commissioner.  (R. at 1-4.)  Plaintiff timely appealed the Commissioner's decision

pursuant to 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.**     **Factual History**

      **1.**     **Age, Education, and Work Experience**

      Plaintiff was born on June 30, 1950, and he was 62 years old at the time of the November

2012 hearing before the ALJ, and 63 years old at the time of the April 2014 hearing.  (R. at 55, 99,

269, 273, 300.)  He received his GED.  (R. at 99.)  According to his work history report, he worked

as a mason brick layer from 1976 until 1999; an agent organizer from 1999 to 2004; a treasurer of

the union of bricklayers from 2004 until 2005; and a foreman from 2005 until 2009.  (R. at 302.)

##### 2.      Medical, Psychological, and Psychiatric Evidence[3]

On December 29, 2008, Plaintiff presented to Andrew E. Park, M.D., at Texas Spine Consultants, LLC, following two injections with a Dr. Racz. (R. at 470.) He had received 30-40% relief from the injections. (*Id*.) Dr. Park diagnosed him with right lateral and anterior thigh pain and possible lumbar stenosis. (*Id*.)

On March 25, 2009, Plaintiff returned to Dr. Park with reports of low back pain and right leg pain as well as the onset of moderate neck pain and bad headaches. (R. at 469.) X-rays of his cervical spine revealed moderate cervical spondylosis with marked disc collapse at C4/5, C5/6, and C6/7 as well as mild subluxation at C2/3 and C3/4 with flexion and extension. (*Id*.)

On November 13, 2009, Plaintiff presented to Dr. Jeffrey M. Schussler, M.D., at HeartPlace, Baylor Dallas Cardiology (HeartPlace). (R. at 405.) Dr. Schussler noted Plaintiff's chief complaints as shortness of breath and atrial fibrillation. (*Id*.) Plaintiff had a history of obesity and obstructive sleep apnea, for which he sometime wore a bilevel positive airway pressure (BIPAP), and he had intermittent palpitations over the last six months. (*Id*.) He noted that Plaintiff adhered to his low carbohydrate, low salt diet and regularly walked. (*Id*.) Plaintiff engaged in daily alcohol use, however. (*Id*.) Dr. Schussler's impressions were atrial fibrillation with rapid ventricular response, obstructive sleep apnea, obesity, borderline hypertension, mild cardiomyopathy, and an ejection fraction (EF) that was on the low side. (R. at 406.) He prescribed him Coumadin and Cardizem and recommended that he come back for a transesophageal echo and cardioversion (TEE) the next Wednesday. (*Id*.)

---

[3]Because only Plaintiff's physical impairments are at issue, a full recitation of the psychological and psychiatric evidence is unnecessary. Psychological and psychiatric evidence is noted when it includes information relevant to the physical impairments at issue, however.

Plaintiff underwent the TEE on November 18, 2009, which revealed a normal left ventricle function, no thrombus in the left atrial appendage, no significant valvular stenosis or regurgitation, and mild plaque in the descending aorta.  (R. at 532.)

Plaintiff saw Dr. Schussler on December 18, 2009, who noted that Plaintiff was back in atrial fibrillation, which might have been coarse fibrillation or flutter with variable block.  (R. at 403.) Plaintiff was not having any chest pains or shortness of breath, and although his heart rate was high, it was not particularly bad.  (*Id*.)  He had started on Flecanide that past Thursday and wanted to discuss his options.  (*Id*.)  Dr. Schussler requested that Plaintiff continue medications, and he planned to perform cardioversion on Flecanide.  (R. at 404.)  If the cardioversion failed, he would enlist the aid of an electrophysiologist (EP doctor) for consideration of atrial fibrillation ablation. (*Id*.)

On January 18, 2010, Plaintiff returned to Dr. Schussler for a follow-up visit. (R. at 401.) Plaintiff had no palpitations or atrial fibrillation that he knew of since his most recent cardioversion. (*Id*.)  He tolerated the Flecanide, but he ran out of his calcium channel blocker.  (*Id*.)  Dr. Schussler noted that he should continue on his current medications, including Coumadin.  (R. at 402.)  He wanted to re-evaluate his EF in six months, as it was in atrial fibrillation the last time it was checked. (*Id*.)  He also encouraged Plaintiff to start a more rigorous diet and exercise program.  (*Id*.)

On May 7, 2010, Plaintiff presented to the Arthritis Centers of Texas to see Dr. Iftikhar A. Chowdhry, M.D., a rheumatologist.  (R. at 454.)  Plaintiff reported neck pain on the right side, right shoulder pain, and an inability to raise his right arm for the past several months.  (*Id*.)  He also reported stiffness in the morning for about 30 minutes as well as pain in his left hand and finger. (*Id*.)  He had almost constant pain on his right side in the neck, shoulder, lower back, and down to

4

his arm.  (*Id*.)  He had trouble sleeping at night due to the right-side pain.  (*Id*.)  In a health assessment questionnaire, Plaintiff reported difficulty lifting or moving heavy objects, some difficulty standing up from a chair, getting on and off the toilet, reaching down for a 5 pound object, doing yard work, waiting in line for 15 minutes, and going up or down two or more flights of stairs. (R. at 455.)  He assessed his fatigue level at a 4 out of 10 and his pain as a 5 out of 10 on a visual analogue scale.  (*Id*.)  Upon examination, he did not appear to be in acute distress and he had fair range of motion in his bilateral wrists, elbows, and shoulders.  (*Id*.)  He had no acute synovitis of his hand joints, although there was some bulging Heberden nodes developing.  (*Id*.)  There was no significant swelling overlying his right shoulder joint, and he had tenderness of his right shoulder anteriorly that decreased internal rotation.  (*Id*.)  X-rays of his cervical spine revealed moderate degenerative disc disease with mild spondylolisthesis and spondylosis.  (R. at 456.) He was diagnosed with right shoulder pain from degenerative joint disease, cervical spondylosis with spondylolisthesis, osteoarthritis-generalized, morbid obesity, right rotator cuff tendinitis, obstructive sleep apnea on CPAP, chronic obstructive pulmonary disease (COPD), atrial fibrillation, hyperlipedemia, and hypertension.  (*Id*.)  Dr. Chowdhry's plan included injecting Plaintiff's right shoulder with Cortisone, prescribing a course of Celebrex at 200 milligrams a day, and prescribing Skelexain, a muscle relaxant.  (*Id*.)

Plaintiff returned to Dr. Chowdhry on May 19, 2010, for a follow-up visit due to his right rotator cuff tendinitis, cervical spondylosis, and osteoarthritis.  (R. at 451.)  He complained of fatigue and tiredness as well as constipation, dry skin, and borderline thyroid function.  (R. at 455.) He had shortness of breath when walking for long distances as well as pain in his bilateral lower extremities.  (R. at 451.)  Although he reported right shoulder pain, it was better with the Cortisone

injection, and he had been able to function and use his right shoulder better.  (R. at 455.)  The Celebrex and Skelaxin had improved his overall osteoarthritis and back pain.  (*Id*.)  Dr. Chowdhry noted that he had fair range of motion of his bilateral hand joints and elbows, and there was no significant swelling.  (R. at 452.) His right shoulder had improved abduction and internal and external rotation.  (*Id*.)  There was some decreased range of motion in his lumbar spine as well as tenderness along the paraspinal muscles of his lumbar spine.  (*Id*.)  Plaintiff had fair range of motion in his bilateral hips, crepitus of his bilateral knees, and some tenderness without swelling of his ankles and toes.  (*Id*.)

On June 16, 2010, Plaintiff complained of pain in his neck, hands, and lower back as well as fatigue and a lack of sleep at night.  (R. at 448.)  He still had residual pain in his right shoulder, but the Cortisone injection improved his acute pain.  (*Id*.)  He snored at night and had obstructive sleep apnea, but he had not been able to use his sleep apnea machine.  (*Id*.)  He did not report any swelling or significant morning stiffness.  (*Id*.)  He denied weakness or dizziness. (*Id*.)  Upon examination, there was no acute synovitis of his joints, but he had tenderness of his right shoulder anteriorly.  (R. at 449.)  He had fair range of motion in his cervical and lumbar spine and in his bilateral hips, knees, and ankles.  (*Id*.)  He had tenderness of his bilateral lateral epicondylar area but no swelling of his lower extremities.  (*Id*.)

On July 19, 2010, Plaintiff underwent a TEE, which revealed a normal EF at an estimated 60%, no significant valvular stenosis or regurgitation, and no pericardial effusion.  (R. at 400.)  Dr. Crowdhry prescribed Cymbalta and recommended that he exercise daily.  (R. at 449.)

Plaintiff returned to Dr. Schussler that same day, complaining of headaches that he suspected were due to his depression.  (R. at 398.)  Dr. Schussler found that he was doing quite well as his

atrial fibrillation had been quiescent since his cardioversion, and he saw no sign of it.  (R. at 399.) His EF had improved, and given his hypertension, Dr. Schussler thought it would be reasonable for him to stop Coumadin and start on regular aspirin.  (*Id*.)

On July 28, 2010, Plaintiff returned to Dr. Chowdhry with complaints of pain in his right shoulder, which had started to develop again despite improvement from the Cortisone injection.  (R. at 445.)  Plaintiff also complained of difficulty lifting his right shoulder above head level; an inability to sleep, especially on the right side; low back and bilateral knee pain; and fatigue.  (*Id*.) He had stopped taking his medication, his physical activities had been affecting his right shoulder adversely, and his tendinitis had flared up.  (*Id*.)  Upon examination, he had mild features of osteoarthritis in his hands.  (*Id*.)  He had fair range of motion in his bilateral hand joints, elbows, cervical and lumbar spine, bilateral hips, and ankles and feet.  (R. at 446.)  He had decreased range of motion of his right shoulder, however.  (*Id*.)  He also had crepitus in his knees.  (*Id*.)  Dr. Chowdhry gave him another injection in his right shoulder, witched his Skelaxin to Amrix, switched his Cymbalta to Savella, and prescribed him Vicodin.  (R. at 447.)

Plaintiff had a follow-up visit with Dr. Chowdhry on August 25, 2010.  (R. at 442.)  Plaintiff reported that using the moving equipment on his farm hurt his right shoulder, and he could not sleep on it anymore.  (*Id.*)  He was stiff in the morning, had difficulty using his right extremity, and was tired and fatigued.  (*Id.*)  Dr. Chowdhry noted that he had tenderness of his right shoulder anteriorly, difficulty raising his shoulder above 90 degrees, and decreased internal and external rotation.  (R. at 443.)  Dr. Chowdhry recommended magnetic resonance imaging (MRI) of the right shoulder to rule out a rotator cuff tear as well as physical therapy for the right shoulder.  (*Id*.)

Plaintiff complained of worsening pain in his neck and shoulder on September 15, 2010.  (R.

at 439.)  Prednisone had helped him initially, but the pain returned once it tapered down.  (*Id.*)  He had marked decreased range of motion of his right shoulder with local tenderness and tenderness of the paracervical muscles.  (R. at 440.)  He had fair range of motion in his other joints, however.  (*Id.*)  Dr. Chowdhry noted that an MRI of his shoulder from August 31, 2010, revealed two small loose bodies inferior to the coracoid process with a small glenohumeral joint effusion.  (R. at 440, 590-91.)  There was also mild thickening of the inferior gelnohumeral ligament along the glenoid side supraspinatus tendiopathy and mild reactive inflammation in the sub deltoid bursa. (R. at 440.)

Plaintiff returned to Dr. Chowdhry on December 1, 2010, with reports of stiffness in the morning, which went away gradually.  (R. at 434.)  Although he was not doing a lot of work, he complained of lots of pain in his right shoulder.  (*Id.*)  Dr. Chowdhry noted tenderness of his bilateral metacarpophalangeal joints (MCP) joints.  (*Id.*)  He had minimal swelling of his second MCP on the left side and some swelling of the right MCP and first carpometacarpal (CMC) on both sides.  (*Id.*)  He also had marked decreased range of motion of his right shoulder with local tenderness, but he had fair range of motion of his elbows.  (*Id.*)  Dr. Chowdhry recommended that Plaintiff hold off his steroid injection in the shoulder and try to work up to physical therapy.  (R. at 435.)

On January 3, 2011, Plaintiff presented to Dr. Thomas C. DiLeberti, M.D., at the Texas Hand Center.  (R. at 421.)  He complained of left basilar thumb pain that had been present for several years but had worsened recently.  (*Id.*)  Plaintiff also complained of intermittent left middle finger pain.  (*Id.*)  Examination revealed swelling and tenderness to palpation at the left thumb CMC joint.  (R. at 422.)  He had approximately a 25 degree loss of flexion on the left middle finger MCP joint, and there was pain at the extreme of flexion with some crepitation.  (*Id.*)  An x-ray revealed no acute

bony or soft tissue abnormalities in the left wrist or hand, but there was moderate CMC joint arthritis and middle finger MCP joint arthritis. (*Id.*) Dr. DiLeberti suggested initial conservative care, which included activity modifications with specific avoidance of pinching and fine manipulation activities. (*Id.*) He also gave Plaintiff a left thumb CMC joint injection, for relief of swelling, inflammation, and pain. (R. at 422-23.)

On January 20, 2011, Dr. Schussler noted that he had not seen Plaintiff since July 2010, and that as best as he could tell, Plaintiff has been doing well since the last visit. (R. at 396.) Plaintiff had not been wearing his continuous positive airway pressure (CPAP) because he felt that he was sleeping better. (*Id.*) Because his blood pressure was elevated, Dr. Schussler recommended that Plaintiff obtain a blood pressure cuff and start checking it at home more often. (R. at 397.)

On August 8, 2011, Plaintiff returned to Dr. DiLeberti due to a recurrence of his symptoms with his left hand. (R. at 424.) His previous injection had given him total relief until two months ago, and he wanted to continue conservative care. (*Id.*)

On October 24, 2011, Plaintiff presented to Dr. Chowdhry for persistent right shoulder pain, pain in his left thumb, and pain in his bilateral knees. (R. at 432.) Dr. Chowdhry found mild tenderness of Plaintiff's left thumb and noted that his Finkelstein's test was positive. (*Id.*) He had tenderness in his bilateral shoulders, and he could not lift up his left shoulder. (*Id.*) He also had crepitus of his bilateral knees. (*Id.*) He was assessed with De Quevain's tenosynovitis left thumb, left shoulder rotator cuff tendinitis that was worse than the right shoulder, left knee pain from degenerative arthritis, cervical spondylosis and spondylolisthesis, excessive fatigue, low back pain, history of atrial fibrillation, obstructive sleep apnea without using CPAP, and "morbid obesity/COPD/asthma/hyperlipidemia/hypertension." (R. at 433.) Dr. Chowdhry injected his left

thumb with steroids.  (*Id.*)

On April 10, 2012, Dr. Kim Rowlands, M.D., a state agency medical consultant (SAMC), completed a Physical Residual Functional Capacity (RFC) assessment for Plaintiff.  (R. at 458-465.) She noted a primary diagnosis of De Quervain's tenosynovitis left thumb and a secondary diagnosis of left shoulder rotator cuff tendonitis.  (R. at 458.)  She listed his left knee pain from degenerative arthritis as another alleged impairment.  (*Id.*)  She opined that Plaintiff had the physical RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; to stand and/or walk (with normal breaks) for at least 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push and/or pull an unlimited amount of weight with hand and/or foot controls; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; frequently balance and stoop; and occasionally kneel, crouch, or crawl; limited reaching (including overhead), handling (gross manipulation), and fingering (fine manipulation), and unlimited feeling; and no visual, communicative, or environmental limitations.  (R. at 459-462.)  Dr. Rowlands noted Plaintiff's exertional limitations were due to his lumbar pain and the osteroarthritis in his knees.  (R. at 459.) She further noted that his manipulative  reaching limitation was due to his rotator cuff tendonitis on the left, and his manipulative limitations were generally limited on the left due to his thumb tenosynovitis and middle finger arthritis.  (R. at 461.)  She referenced Plaintiff's October 24, 2011, August 8, 2011, and May 19, 2010 physical exams, and noted that he had no problems with self-care activities. (R. at 465.)  She noted that he reported arthritis and inability to walk far without needing a break, but he was able to prepare complete meals, do laundry and some house cleaning, go outside everyday, drive a car, go grocery shopping, and talk and hear friends on the phone.  (*Id.*)  Dr. Rowlands found that his limitations were partially supported by the medical evidence and other

evidence of record.  (*Id.*)

On May 2, 2012, Dr. Randal Reid, a SAMC, completed a Case Assessment for reconsideration of the April 10, 2012 RFC assessment.  (R. at 466.)  Based upon all the evidence in the record, he reaffirmed the RFC.  (*Id.*)

On May 11, 2012, Plaintiff returned to Dr. Schussler at the HeartPlace.  (R. at 490.)  Dr. Schussler noted that he had been doing well since the last time he saw him, and he had very infrequent episodes of "fluttering."  (*Id.*)  Plaintiff tried using his CPAP again, and he had not been using it as much as Dr. Schussler would like.  (*Id.*)  His exercise routine consisted of regular walking.  (*Id.*)  An electrocardiogram (EKG) revealed an incomplete right bundle branch block of his sinus badycardia.  (*Id.*)  Plaintiff was also looking into disability as a result of his arthritis.  (*Id.*)  Dr. Schussler counseled him on weight loss, exercise, and medication compliance.  (R. at 491.)

Plaintiff presented to Dr. Schussler on November 8, 2012, due to an irregular heart beat that Dr. Chowdhry found.  (R. at 487.)  Plaintiff's EKG, however, looked more consistent with atrial flutter.  (*Id.*)  His blood pressure was also more elevated than usual, and Dr. Schussler prescribed him a beta blocker.  (R. at 487-88.)

On November 13, 2012, Plaintiff underwent a TEE and cardioversion at which time his EF was 20%.  (R. at 478.)  His normal sinus rhythm was restored, and he felt significantly better.  (*Id.*)

On November 30, 2012, Plaintiff saw Dr. Schussler to see if his EF had improved and if he was in flutter.  (R. at 481.)  His EF had improved, but he was still in flutter.  (*Id.*)  Dr. Schussler recommended that he see an EP doctor to consider ablation for his atrial flutter.  (R. at 482.)

Plaintiff saw Robert C. Kowal, an electrophysiology (EP) doctor at HeartPlace, on December 6, 2012.  (R. at 478.)  Plaintiff reported that he had no recurrent dizziness with near-syncope, but

he did have shortness of breath with minimal to moderate exertion. (*Id.*) He also reported occasional palpitations but denied chest pain. (*Id.*) Dr. Kowal assessed him with atrial flutter and persistent atrial fibrillation. (R. at 479.) His plan included an EP study with combined ablation of atrial fibrillation and atrial flutter on January 3, 2013. (R. at 480.)

Plaintiff returned to Dr. Schussler on February 21, 2013, for a follow-up examination. (R. at 475.) Plaintiff felt significantly better since his procedure on January 3, 2013, had no symptoms of palpitations, and had a fairly substantial improvement in his fatigue and ability to walk. (*Id.*)

Plaintiff also presented to Dr. Chowdhry on February 21, 2013, for a follow-up visit regarding his osteoarthritis, shoulder pain, and thumb pain. (R. at 582.) He complained that his left shoulder had been bothering him, he had difficulty sleeping, he recently stepped in a hole and twisted his back, he noticed an irregular heartbeat, and he was feeling tired and short of breath in the past week. (*Id.*) Dr. Chowdhry assessed Plaintiff with fibromyalgia, chest pain, shortness of breath, unspecified disorders of bursae and tendons in his shoulder region, fatigue, atrial fibrillation, and back pain. (R. at 583.)

He returned to Dr. Chowdhry on April 26, 2013, with complaints of pain in his right knee and ankle. (R. at 579.) They discussed treatment for his fibromyalgia, his shoulder pain, his atrial fibrillation, his back pain, and his knee osteoarthritis. (R. at 580.) Dr. Chowdhry gave him a right knee intrarticular corticosteroid injection. (*Id.*)

Plaintiff saw Dr. Komal on May 3, 2013, with complaints of not feeling well in the past two months. (R. at 472.) He also complained of chronic fatigue, low energy, and some dizziness with position changes. (*Id.*) His heart rate had been running low at home at 47-52 beats per minute. (*Id.*) Dr. Komal assessed that he had no recurrent arrhythmia since his procedure, and he was having

symptomatic bradycardia.  (R. at 473.)  Plaintiff's event monitor correlated his symptoms of fatigue and sinus bradycardia.  (*Id*.)

On June 28, 2013, Plaintiff visited Dr. Chowdhry due to pain in his left shoulder and thumb. (R. at 575.)  Upon examination, there was no clubbing, edema, or cyanosis; normal peripheral pulses; no back tenderness; normal range of motion in all joints; no synovitis, and decreased range of motion in left shoulder.  (*Id*.) Dr. Chowdhry noted that the injection in Plaintiff's right knee helped him.  (R. at 568.)  He gave him an injection in his left CMC joint due to marked tenderness there.  (R. at 577.)

On that same date, Dr. Chowdhry completed a representative-supplied physical RFC questionnaire for Plaintiff.  (R. at 533.)  He opined that Plaintiff had the physical RFC to sit for 2 hours in an 8-hour workday for 15 minutes at a time; stand/walk for 1 hour in an 8-hour workday while standing 5 minutes at a time; and lie down/recline for 5 hours in an 8-hour workday due to pain, weakness, fatigue, shortness of breath, headaches, and decreased hearing.  (*Id*.) He also opined that Plaintiff would need flexibility to change positions frequently and  could occasionally lift up to 20 pounds due to his back pain, arthritis, and asthma.  (R. at 533-534.)  Dr. Chowdhry noted that Plaintiff's arthritis pain and lack of mobility would limit any repetitive action involving simple grasping, pushing and pulling, and fine manipulation on both the right and left side.  (*Id*.)  He noted muscle spasms and arthritic changes as objective signs of pain, and he opined that his pain was moderate to severe.  (*Id*.)  Finally, he opined that the pain was expected to interfere with attention and concentration continuously; Plaintiff would need frequent rest periods during the day; and Plaintiff would probably miss work frequently (4 or more days a month) due to exacerbations of pain and symptoms.  (*Id*.)

13

On July 10, 2013, Plaintiff presented to Dr. Dean Dimmitt, M.D., at MedProvider, for his six month follow-up. (R. at 555.) Dr. Dimmitt noted that Plaintiff had no new interval cardiovascular or neurologic symptoms and that Plaintiff was well-developed, well nourished, and in no acute distress. (R. at 557.) His impressions were hypercholersterolemia, chronic congestive heart failure, pre-diabetes, and obstructive sleep apnea. (R. at 558.) He recommended that Plaintiff follow a regular exercise program and lose weight for better health. (R. at 559.)

Plaintiff presented to Dr. Chowdhry on September 3, 2013, for a follow-up visit. (R. at 566.) Dr. Chowdhry noted that the CMC injection helped his pain, but he had ongoing pain in his joints. (R. at 567.) Additionally, Plaintiff's MRI of the right shoulder on July 10, 2013, revealed two tendon partial tears. (*Id.*)

That same day, Plaintiff presented to the Shoulder Center to see Dr. Sumant G. Krishnan, M.D. (R. at 720.) Dr. Krishnan gave him a Lidocaine injection in his left shoulder, which produced 100% relief from pain and an 160 degree improvement in elevation. (*Id.*) He diagnosed him with left shoulder symptomatic impingement, a.c. joint arthroisis, and rotator cuff tear with mild symptomatic glenohumeral arthritis. (R. at 721.) He recommended that Plaintiff receive left shoulder rotator cuff repair surgery. (*Id.*)

Plaintiff returned to Dr. Dimmitt on September 23, 2013, for a preoperative evaluation. (R. at 542.) Plaintiff was scheduled for a rotator cuff repair surgery on September 27, 2013, and he complained of back and joint pain. (R. at 544.) Dr. Dimmitt found that Plaintiff appeared to be at average operative risk. (R. at 547.) An EKG performed that day revealed a normal bradycardia with a rate of 53. (*Id.*)

Plaintiff underwent rotator cuff repair surgery for his left shoulder on October 4, 2013. (R.

at 619.)

On October 7, 2013, Plaintiff presented to the emergency department at Texas Health Kaufman for concern of impacted food bollus.  (R. at 596.)  Plaintiff contended that he was eating re-heated chicken and swallowed without chewing much.  (*Id*.)  He had pain and was able to tolerate some liquids but had not tried any solids.  (*Id.*)  He was transferred to a doctor at Baylor Dallas with a diagnosis of an esophageal foreign body and dysphagia.  (R. at 599.)  Upon arrival at Baylor, the food was removed from the lower third of his esophagus.  (R. at 608.)

On October 8, 2013, Plaintiff saw Dr. Krishnan, who noted that Plaintiff was doing well following the surgery.  (R. at 701-702.)

On October 22, 2013, and November 19, 2013, Plaintiff was still doing well following his surgery, as there was good strength of his rotator cuff and his wounds were well-healed.  (R. at 698, 695.)

On November 5, 2013, Plaintiff returned to Dr. Chowdhry with complaints of increased neck and back pain due to the shoulder sling he wore following his surgery as well as numbness, pain, and stinging in his right thigh when he walked.  (R. at 717.) Upon physical examination, he noted Plaintiff wore a sling to his left upper extremity, there was no synovitis, and Plaintiff was well-nourished, and in no acute distress.  (R. at 718.)   Plaintiff was assessed with fibromyalgia, atrial fibrillation, back pain, knee osteoarthritis, and fatigue.  (*Id.*)

He returned to Dr. Chowdhry on December 31, 2013, with complaints of neck and shoulder pains as well as a strained right knee.  (R. at 672.) Upon examination, Dr. Chowdhry found no cyanosis, clubbing, or edema; normal peripheral pulses; no back tenderness; normal range of motion in all joints; no synovitis; and no neurologic deficits.  (*Id*.)  He gave Plaintiff a corticosteriod

injection in his right knee.  (R. at 673.)

That same day, Dr. Krishnan noted upon examination that Plaintiff continued to do well with his left shoulder, which had excellent range of motion  (R. at 692.)

On January 8, 2014, Plaintiff returned to Dr. Dimmitt for his annual physical.  (R. at 678.) While his left shoulder continued to improve after the surgery, he complained of neck, back, and joint pain.  (R. at 678, 681.)  His physical examination was unremarkable, however.  (R. at 682.)

Plaintiff presented to Dr. Krishnan on April 1, 2014.  (R. at 812.)  Dr. Krishnan noted that Plaintiff was doing extremely well and had no joint pain.  (*Id.*).

On April 14, 2014, Dr. Chowdhry completed an arthritis RFC questionnaire on Plaintiff's behalf.  (R. at 753.)  He opined that Plaintiff had osteoarthritis, cervical spondylosis, and shoulder pain.  (*Id.*)  His  symptoms were back, neck, and shoulder pain with stiffness in the morning, which was usually related to activity and exertion.  (*Id.*)  Dr. Chowdhry identified reduced range of motion in his shoulder, neck, knee and hand; reduced grip strength; impaired sleep; tenderness; crepitus in the knees; and trigger points as positive objective signs.  (*Id.*)  He noted that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations, and anxiety affected his physical condition.  (*Id.*)  He opined that Plaintiff's experience of pain or other symptoms was severe enough to frequently interfere with attention and concentration needed to perform even simple tasks.  (R. at 754.)  Plaintiff could tolerate moderate work stress, and his impairments could be expected to last for at least 12 months.  (*Id.*)  He opined that Plaintiff could walk 2 to 3 city blocks without rest or severe pain; he could sit for 1 to 2 hours at one time; he could stand for 20 to 30 minutes at one time; he could sit for about 4 hours in an 8-hour workday; and stand/walk for 2-3 hours in an 8-hour workday.  (*Id.*)  Plaintiff would need to include periods of walking for 10 minutes

16

every 30 to 40 minutes during an 8-hour workday.  (R. at 755.)  He needed a job that permitted shifting positions at will from sitting, standing or walking, and he would only need to take unscheduled breaks for about 5 to 10 minutes during an 8-hour workday during a flare.  (*Id.*)  He opined that in a competitive work situation, Plaintiff could frequently lift up to 20 pounds but rarely lift 50 pounds; he could twist frequently, and stoop, crouch, and climb ladders and stairs occasionally.  (*Id.*)  He also estimated that Plaintiff would be absent from work about 4 days per month.  (*Id.*)

On April 24, 2014, Plaintiff saw Dr. Robert C. Schwartz, who was board certified in psychiatry and neurology.  (R. at 804.)  He noted that Plaintiff complained of being mildy depressed and excessively worrying.  (*Id.*)  Dr. Schwartz assessed him with mood disorder NOS 296.90; attention-deficit/hyperactivity; osteoarthritis in neck, knees, and lumbar back; atrial fibrillation and ablation; and COPD.  (*Id.*)

On May 30, 2014, Plaintiff presented to Dr. Chowdhry for a follow-up visit for his neck and shoulder pain, fibromyalgia, and knee osteoarthritis.  (R. at 829.)  He complained that he had increased neck pain as well as numbness in his right thigh, and pain and stinging in that thigh when walking.  (*Id.*)  He also reported issues with his hands and knees, but he was still working and needed to use his medications to control his pain.  (*Id.*)

Plaintiff saw Dr. Dimmitt for a 6-month follow-up visit on July 9, 2014.  (R. at 833.) Plaintiff underwent an MRI due to a visual field cut seen during an eye exam, and the MRI was negative.  (*Id.*)  Dr. Dimmitt noted that Plaintiff's asthma was well-controlled.  (*Id.*)

On July 25, 2014, Plaintiff returned to Dr. Chowdhry complaining of increased pain in his knees, feet, and low back as well as soreness in his hands and tightness in his neck.  (R. at 827.)  He

denied joint swelling. (*Id*.) Dr. Chowdhry found that he had normal range of motion in all joints and no synovitis, but he had tenderness to the cervical and lumbar regions. (*Id.*)

### 3.      Hearing Testimony from November 5, 2012

On November 5, 2012, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 41-86.) Plaintiff was not represented by an attorney. (R. at 46-47.)

#### a.      *Plaintiff's Testimony*

Plaintiff told the ALJ that he suffered from asthma and COPD. (R. at 49-50.) He quit smoking 16 years ago, and he had been treated for asthma for about 10 years. (R. at 50.) Dr. Dimmitt had been treating him for his asthma. (R. at 51.) His breathing related problems interfered with his ability to work. (R. at 50.)

He had an irregular heartbeat, or heart arrhythmia, about 3 years prior. (R. at 52.) It lasted for two weeks and returned, but his heartbeat was normal at the time of the hearing. (*Id*.) He still had heart palpitations, but he was not being treated for that. (R. at 53.)

Plaintiff stopped working in November 2009, the month he allegedly became disabled. (R. at 53-54.)

Plaintiff testified that he was born on June 30, 1950; he was 62 years old, married, right-handed, 5 feet 9 inches tall, and weighed about 275 pounds. (R. at 55.) He completed his GED and had no military service. (R. at 56.)

His last job was as a masonry foreman for Texas Stone and Tile. (*Id*.) He worked there since August of 2005 and stayed with that job for 4 ½ to 5 years. (R. at 56-57.) He had not worked there or anywhere else since November 2009. (R. at 56.) He stopped working in November 2009 because it was close to when he had his heart issue during an overnight stay at Baylor Hospital. (R.

at 56-57.)  Texas Stone and Tile laid him off and told him that they did not have any more work, but Plaintiff believed they laid him off due to his health.  (R. at 58-59.)  He had trouble climbing scaffolds because of his breathing problem.  (R. at 59.)  He used an Advair and a Proair rescue inhaler to treat his asthma, and he had used a CPAP to treat sleep apnea for about 6 years.  (*Id.*)

He testified that he had shortness of breath both with and without exertion.  (R. at 60.)  He had not gone to the emergency room or hospital for any breathing related problems in the last year.  (*Id.*)  He had been diagnosed with asthma and an occasional bronchitis but not with emphysema.  (R. at 61.)  About once a year, he had been getting a bronchiole infection, which usually cleared up in about 10 days if he went to the doctor soon enough.  (*Id.*)

He had arthritis in the thumb joint in his left hand, and he received 4 shots in the joint from Dr. Chowdhry at the Arthritis Centers of Texas.  (R. at 62.)  He also received 2 shots in his right hand as well as surgery in 2009.  (R. at 63-64.)  His hand still hurt if he moved it a lot.  (R. at 64.)

He had problems with his left shoulder for a long time, and it got really bad in 2004.  (R. at 66.)  There was pain in the rotary cuff area and down his arm, and his doctor diagnosed him with bursitis.  (R. at 67.)  He had physical therapy and injections in both of his shoulders. but he had not undergone surgery on his left shoulder at that time.  (*Id.*)

Plaintiff also testified that he had degenerative arthritis in his neck.  (R. at 68.)  He also had arthritis in his left knee, and it caused pain and weakness when he turned the wrong way.  (R. at 69.)  He received shots in the knee due to the problems it caused.  (*Id.*)

He was diagnosed with strained lower lumbar in his lower back, but he contended it was arthritis.  (*Id.*)  He had two series of spinal injections.  (*Id.*)

In addition to being a bricklayer, he was a business manager, a union president, and foreman.

(R. at 72.)  As a masonry foreman, he had to work alongside the other workers and inspect their work.  (R. at 73.)  He was a business agent for 5 years, and in that job he had to work offsite and visit contractors.  (R. at 74-75.)  He was a union president for 1 year. (R. at 76.)  In response to questions from the ALJ, Plaintiff testified that he could not occasionally lift and carry 20 pounds on the job, and he could not stand and walk with normal breaks for 6 hours of an 8-hour workday.  (R. at 78.)  He testified that he could not climb ladders, ropes, or scaffolds because he often ran out of breath, was fatigued, and his shoulder prevented climbing.  (R. at 78-79.)

After the VE's testimony, Plaintiff testified that he could not sit for very long due to pain in his back.  (R. at 84.)  He also had a pinched nerve in his right leg, which went into effect after he had been on his feet for about 30 or 45 minutes.  (R. at 85.)

### b.   VE's Testimony

The VE classified Plaintiff's past relevant work as a brick layer, masonry (SVP:4, heavy, DOT[4] 869.664-014); construction masonry supervisor (SVP:7, light, DOT 860.137-010); and union representative (SVP:8, sedentary, DOT 187.167-018).  (R. at 80.)

The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's same age, education, and work background could perform his past relevant work if he had an RFC that would allow for light work - occasional lifting/carrying 20 pounds, frequent lifting/carrying 10 pounds; standing/walking with normal breaks for about 6 hours of an 8-hour workday; sitting with normal breaks for about 6 hours of an 8-hour workday; no limitations with regard to pushing or pulling in operating hand or foot controls; occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional kneeling or crouching; no more than occasional overhead reaching

---

[4]The DOT means the Dictionary of Occupational Titles.

with the left arm; occasional feeling with the left hand; and avoiding even moderate exposure to fumes, odors, dust, gases, and environments with poor ventilation. (R. at 80-81.) According to the VE, the hypothetical person could still perform the union representative position. (R. at 82.)

After the ALJ modified the hypothetical to include an RFC for sedentary work - occasional lifting/carrying 10 pounds, frequently lifting/carrying less than 10 pounds, standing/walking with normal breaks for at least 2 hours of an 8-hour workday and sitting for about 6 hours of an 8-hour workday with normal breaks and rest periods - the VE testified that the hypothetical person could still perform the union representative position. (*Id.*)

The ALJ also asked whether a hypothetical person who could occasionally lift/carry 10 pounds or less; frequently lift/carry less than 10 pounds; stand/walk for at least 2 hours in an 8-hour workday but for less than 6 hours of an 8-hour workday would be precluded from full time competitive work in the economy. (R. at 83.) The VE opined that such a hypothetical person would be precluded from full-time competitive work in the economy. (*Id.*)

### 4.    The ALJ's April 12, 2014 Decision

The ALJ issued his decision denying benefits on April 12, 2013. (R. at 135-142.) At step one,[5] he found that Plaintiff had not engaged in substantial gainful activity since November 22, 2009, his alleged onset date. (R. at 137.) At step two, he found that Plaintiff had eleven severe impairments: chronic obstructive pulmonary disease (COPD), asthma, degenerative disc disease of the spine, history of atrial fibrillation, hypertension, degenerative joint disease of the right shoulder, left knee pain, degenerative joint disease of the hands, status post right trigger thumb release, sleep apnea, and morbid obesity. (*Id.*) Despite those impairments, at step three, he found that Plaintiff

---

[5]The references to steps one to four refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

had no impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.) Next, the ALJ determined that Plaintiff had the RFC to perform a full range of light work as follows: lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; occasionally climb ramps and/or stairs, kneel, and crouch; never climb ladders, ropes, or scaffolds; occasional overhead reaching with left arm; occasional feeling with left hand, avoid even moderate exposure to fumes, odors, dusts, gases, and environments with poor ventilation. (R. at 137-138.) At step four, based on the VE's testimony, he found that Plaintiff was capable of performing past relevant work as a union representative (sedentary, SVP:8). (R. at 142.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from his onset date through the date of the ALJ's decision. (*Id*.)

> **5.      September 25, 2013 Order of Appeals Council Remanding Case to ALJ**

On September 25, 2013, the Appeals Council issued an order vacating the ALJ's April 12, 2013 decision and remanding the case to the ALJ. (R. at 147.) The Council noted that Plaintiff had submitted new and material evidence regarding new-onset atrial flutter in November 2012 and a cardiac ablation in January 2013 that warranted consideration under the sequential evaluation process. (*Id.*) It also noted that the VE testified that the position of union representative is a skilled position with a SVP of 8, which requires 4 to 10 years to learn the position according to the DOT. (*Id*.) Because Plaintiff did not work as a union representative for at least 4 years, the Appeals Council found that the position did not appear to be valid past relevant work. (*Id*.) It found that further consideration of Plaintiff's past relevant work at step four of the sequential evaluation process was needed. (*Id*.)

The Appeals Council ordered the ALJ to obtain additional evidence concerning Plaintiff's atrial flutter and atrial fibrillation as well as other impairments; to obtain evidence from a medical expert, if necessary, to clarify the nature and severity of his impairments; to give further consideration to his maximum RFC, and to obtain supplemental evidence from a VE to determine whether Plaintiff acquired any skills that were transferable with very little, if any, vocational adjustment to other occupations under the guidelines in Social Security Ruling 82-21.  (R. at 147-48.)  The Appeals Council also instructed the ALJ to identify and resolve any conflicts between the occupational evidence provided by the VE and the information in the DOT and the Selected Characteristics of Occupations (SCO).  (R. at 148.)  Finally, the Appeals Council required the ALJ to offer Plaintiff an opportunity for a hearing, address the evidence which was submitted with the request for review, and take any further action needed to complete the administrative record, and issue a new decision.  (*Id*.)

### 6.     Hearing Testimony from April 22, 2014

On April 22, 2014, Plaintiff, a medical expert (ME), and a different VE testified at a hearing before the ALJ.  (R. at 89-129.)  Plaintiff was represented by an attorney.  (R. at 88.)

#### a.     *ME's Testimony*

The ME testified that Plaintiff had a history of atrial fibrillation that converted into a sinus rhythm back in November 2009.  (R. at 93.)  It had to be converted again in December 2009, and he finally underwent an ablation procedure in January 2013.  (*Id*.)  The ME noted that his ventricular function was internally normal.  (*Id*.)  He had an echo in November 2009 where the disc depression was a bit low and another one in November 2012, but the ejection fraction came back to normal.  (*Id*.)  He noted that after his ablation, Plaintiff had symptoms of fatigue and dizziness related to a

23

slow heart rate, although the doctors did not determine that he needed a pacemaker.  (*Id.*)  The ME referenced Plaintiff's obesity and found that at a weight of 268 and a height of 71 inches, his body mass index (BMI) would be 37.5.  (*Id.*)  Plaintiff had left thumb symptoms, had a diagnosis of DeQuevain's tenosynovitis as well as a diagnosis of arthritis.  (*Id.*)  He also received a couple of injections in his thumb joints.  (R. at 94.)   The ME noted a diagnosis of tendinitis of his left shoulder  in October 2011, and tendinitis of the right shoulder in December 2010. (*Id.*) An MRI of his right shoulder in September 2010 showed bursitis and tendinitis.  (R. at 94.)  The ME referenced the MRI of his left shoulder in July 2013, the rotator cuff surgery, and the degenerative changes in the cervical and lumbar spine which were multi-level or mild.  (*Id.*)  He mentioned the MRI of the lumbar spine in October 2008, which showed moderate degenerative changes with foraminal stenosis and multi-level degenerative disc disease.  (*Id.*)

The ME testified that Plaintiff had "obstructed sleep apnea from playing" and had gone from a "CPAP to not using a CPAP."  (*Id.*)  The ME could not discern from the record Plaintiff's reason for discontinuing use of the CPAP.  (*Id.*)  He noted that Plaintiff was diagnosed as having fibromyalgia in 2013, but he did not see a "tender point count."  (R. at 94-95.)  He also pointed to a diagnosis of arthritis in the left knee and crepitus of the knee.  (R. at 95.)  The ME recalled that Plaintiff's records indicated that he was driving a tractor and moving bales of hay in January 2011, having aches and pains as result of his physical activity, and working to some extent on a farm in August 2010.  (*Id.*)  The ME also expressed his confusion at a later note in the record indicating that Plaintiff was retired and disabled.  (*Id.*)  In a May 2010 study, there was "some vental listhesis of C5 on C4 or C4 on C5.  (*Id.*)  He noted that Plaintiff always complained of fatigue, but he always had more career activity in that period.  (R. at 96.)  He did not see a "meets or equals."  (R. at 95.)

24

When asked what functional limitations might be in order, the ME testified that Plaintiff's limitations would limit him to no more than 10 to 20 pounds of lifting.  (R. at 96.)  The ME then testified that given what was in the record, he would "probably put him to six hours of standing and walking with one to two-hour intervals; sit six out of eight, two-hours intervals; push/pull with the major arm; no ladders, ropes, scaffolds; posturals otherwise are edge on [phonetic]; manipulative, there would be frequent handling and fingering, the left hand; no limit on the right; visual, no limitations; communicative, no limitations; I would avoid even moderate vibrations and avoid hazardous moving machinery and unprotected heights."  (R. at 96-97.)

When asked by Plaintiff's attorney whether Plaintiff had arthritis in both hands or just one, the ME testified that it looked as if he was diagnosed with arthritis in the middle finger of the left hand and the left thumb B and C joints.  (R. at 98.)  He also testified that he put the manipulative at frequent because the presence of arthritis did not mean he could not use his hands and it did not mean that he could only use them rarely or occasionally. (*Id.*)  The ME noted that Plaintiff received good relief for a matter of months after the injection in his hands.  (*Id.*)

### b.    *Plaintiff's Testimony*

Plaintiff's attorney did not have any objection to consideration of Plaintiff's prior testimony. (R. at 99.)  Plaintiff testified that he had GED.  (R. at 99.)  He was right-handed.  (R. at 101.)

Plaintiff testified that he drove a little bit.  (R. at 100.)  He went to the store, but he did not go anywhere far away because his neck did not bend too well.  (*Id.*)   He did not think it was safe for him to drive too far, and his wife did most of the driving.  (*Id.*)  He did not have good range of motion on the left side of his neck due to arthritis.  (R. at 100.)

Plaintiff worked full-time as a bricklayer until 1999.  (R. at 101.)  He took a break and then

worked as a bricklayer from 2005 until the end of 2009.  (*Id*.)  He was also a business manager for

the Brick Layer's Union, where he was out on job sites as opposed to in an office.  (*Id*.)  While on

the job sites, his objective was to check on the workers and visit them as well as make sure all the

safety issues were "right."  (*Id*.)  He also made sure they were paid up on their dues, cheered them

on, and made sure they continued to be good, solid members of the international union.  (R. at 101-

102.)  He would go up and down stairs and out on the scaffold.  (R. at 102.)

Upon examination by the ALJ, he testified that he was a rookie on the job from 1999 to 2003.

(*Id*.)  He considered himself a novice and not a professional, and he did not know 100% of the job.

(R. at 103.)  He claimed that the difference between a union president and a business manager is that

a union president is "kind of directive over the financial business of union and oversee someone else

is doing my job, which I had another rookie doing that."  (*Id*.)  Once he moved up to the union

president position, he had someone who had a college degree help him out since it was a pretty big

job.  (*Id*.)  He served as the president for a year, and then was moved out of the position due to issues

he raised with how health insurance was paid.  (R. at 106.)  Once he was removed from the

president's position, he went back to being a bricklayer foreman.  (R. at 107.)  He had to ultimately

leave his position as a bricklayer foreman because he had a spell with his heart and an operation on

his hand.  (*Id*.)

He testified that he did not work on the tractor and feed cows back in 2010 on a daily basis.

(R. at 108.)  His wife did a lot of the work, and his sons helped out "kind of regularly."  (*Id*.)  He

was not able to lift bales of hay himself.  (R. at 109.)

The ALJ pointed out instances in the record from October 2010 to January 2011 where

doctors noted that Plaintiff drove a tractor and moved bales of hay on a daily basis, did a lot of

physical work that put a lot of strain on his shoulders and hands, and overdid work that caused his pain to get worse. (R. at 110.) The ALJ noted that the considerable amount of work on the farm suggested that he could do light work, and he asked Plaintiff if he told the doctors that he was doing more than he was doing. (*Id.*) Plaintiff responded that he told Dr. Chowdhry that he could drive the tractor, but the walking and climbing parts were his biggest problem. (R. at 111.) He said that at the time of the hearing, he did not get on and off the tractor or handle any 50-pound bags of feed. (*Id.*)

His attorney then asked if he could have done the business manager job in 2010 and the beginning of 2011. (R. at 112.) He testified that due to his COPD and the sarcosis in his lungs, he could not have gone back to his business manager job after his last brick layer job. (R. at 112-113.) His biggest problem would have been going to the job sites and physically doing any of the work, such as climbing scaffolds and inspecting scaffolds. (R. at 113.)

Once Plaintiff left his last brick layer job, he had problems with his knee, his shoulder, and his feet, but his knee was the biggest problem. (R. at 114.) He could not walk for long distances. (R. at 115.) He could walk the length of a football field without stopping if it was smooth and not rough ground. (*Id.*)

He had trouble standing for long periods of time due to numbness, stinging, and itching in the right thigh. (R. at 116.) He could not stand during an entire 30-minute TV show. (*Id.*) He could not climb a flight of stairs from the first floor to the second floor without taking a break. (R. at 116.) One of his biggest problems climbing a scaffold was that he did not have enough breath due to his COPD. (R. at 117.) He would get scared that he could have a heart problem while halfway up the building. (*Id.*)

27

He also had problems bending over and picking things up off the floor.  (*Id.*)  He was unable at that time to reach overhead and pick things up off the top shelf.  (*Id.*)

Upon examination from the VE, Plaintiff testified that from 1999 until 2005, he was an agent organizer that went out and recruited both employers and masons to be in the union.  (R. at 122.) The VE noted that although he previously mentioned that he may have climbed up on scaffolding some, that is not what her records said.  (*Id.*)  Plaintiff also testified that from May 2003 until August 2005, he was the treasurer/president of the Mason's Union where he oversaw all the functions of the union.  (*Id.*)  Reading from the record, VE Brooks asked him to confirm whether he sat 4 out of 8 hours, stood 2 out of 8 hours, and lifted up to 20 pounds as an organizer and business representative from 1999 until 2004.  (R. at 123.)  She also asked him to confirm that while recruiting members from 2009 until 2004,  he sat, stood, and walked for about 2 hours of out the day and lifted 20 pounds.  (*Id.*)  He responded that he lifted a briefcase that may have weighed 20 pounds.  (*Id.*)

### c. *VE's Testimony*

The VE classified Plaintiff's past relevant work as a mason (SVP:6, medium, skilled, DOT 861.381-026); membership solicitor (SVP:4, light, semi-skilled, DOT 293.357-022); and business representative, labor union (SVP:8, sedentary, skilled, DOT 187.167-018). (R. at 124.) She testified that there were circumstances in which the mason position could be practiced at the heavy to very heavy level, but it was job site dependent.  (*Id.*)  She also testified that with the business representative position, one would typically need to perform the job from 4 to 10 years in order to reach the skilled level, and Plaintiff indicated that he performed the job for only about a year and a half.  (*Id.*)  As such, she found that he would be closer to the semi-skilled level.  (*Id.*)

The ALJ asked the VE to opine whether a hypothetical person with the same age, education,

28

and work background as Plaintiff could perform his past relevant work as he may have done it or as normally done in the economy if he had a RFC that allowed for light work - occasional lifting/carrying 20 pounds; frequent lifting/carrying 10 pounds; standing/walking for about 6 hours of an 8-hour workday; sitting for about 6 hours of an 8-hour workday; occasional pushing/pulling with the left arm; no climbing of ladders, ropes, or scaffolds; occasional overhead reaching with the left arm; frequent handling with the left arm; and avoid moderate exposure to vibration, hazardous moving machinery, and unprotected heights.  (R. at 125-126.)  The VE testified that the past work as a membership solicitor could be performed, but not the mason position.  (R. at 126.)  The business representative position could be performed, but not at the skilled level.  (*Id*.)  There were no transferable skills to the sedentary exertion from the membership solicitor position.  (*Id*.)

The ALJ modified the hypothethical to include a RFC at a sedentary level of exertion - occasional lifting/carrying 10 pounds, frequent lifting/carrying less than 10 pounds; standing/ walking for about 2 hours of an 8-hour workday and sitting for about 6 hours of an 8-hour workday, with the other restrictions.  (R. at 127.)  The VE testified that the hypothetical person would be precluded from performing Plaintiff's past relevant work.  (*Id*.)  The ALJ again modified the hypothetical to include an anticipation of missing four days per month on a regular, routine, and ongoing basis, and the VE testified that the modification would not allow for maintaining full-time competitive employment in the economy.  (*Id*.)

Plaintiff's attorney then modified the first hypothetical to add pain that would be expected to continuously interfere with attention and concentration so that at least 34 to 66 percent of the time, the hypothetical person was off-task.  (R. at 128.)  The VE opined that the hypothetical person would not be able to do Plaintiff's past relevant work at the competitive level.  (*Id*.)

### 7.     The ALJ's July 14, 2014 Decision

The ALJ issued his second decision denying benefits on July 14, 2014. (R. at 15-33.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since November 22, 2009, his alleged onset date. (R. at 17.) At step two, he found that Plaintiff had nine severe impairments: degenerative disc disease of the cervical and lumbar spine, history of atrial fibrillation, degenerative joint disease of the right shoulder, degenerative joint disease of the left knee, degenerative joint disease of the hands, status post right trigger thumb release, fibromyalgia, sleep apnea, and morbid obesity. (*Id*.) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) Next, the ALJ determined that Plaintiff had the RFC to perform a full range of light work as follows: lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; occasionally push/pull or reach overhead with his upper left extremity; never climb ladders, ropes, or scaffolds; frequent handling with left upper extremity; and avoid even moderate exposure to vibration, hazardous moving machinery, or unprotected heights. (R. at 19.) At step four, based on the VE's testimony, he found that Plaintiff was capable of performing past relevant work as a membership solicitor (DOT 293.357-022, light, SVP:4). (R. at 32.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from his onset date through the date of the ALJ's decision. (*Id*.)

## II.   ANALYSIS

### A.     Legal Standards

### 1.     Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 and n.1.

## 2.     Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under

31

the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled

or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### B.   Issues for Review

Plaintiff presents two issues for review:

> 1.  Whether the ALJ erred in failing to resolve the inconsistency between the prior hearing testimony from [the first VE] and the subsequent hearing testimony from [the second VE] before relying on [the second VE's] testimony to support his unfavorable decision.
>
> 2.  Whether the ALJ erred in rejecting the opinions of [Plaintiff's] treating and examining physicians in favor of a non-examining, non-treating physician without conducting an analysis of each of the relevant factors provided at C.F.R. § 404. 1527(c).

(doc. 12 at 4.)

### C.   Conflicting Expert Testimony

Plaintiff first contends that the ALJ failed to resolve the conflicting testimony between the two VEs regarding his past relevant work.  (doc. 12 at 17.)  He contends that had the ALJ addressed the conflict and favored the initial testimony of the VE from the April 22, 2014 hearing, he would

33

have found Plaintiff disabled.   (*Id.*)   Plaintiff asserts that the ALJ's failure to resolve the inconsistency between the two VEs' opinions calls into question the reliability of the ALJ's decision. (*Id.*)

Once a case is remanded by the Appeals Council to gather more information about the extent of a claimant's disability, an ALJ is free to reevaluate the facts.  *See Houston v. Sullivan*, 895 F.2d 1012, 1015 (5th Cir. 1989).  The remand order does not bind the ALJ to his earlier decision because to do so would discourage ALJs from reviewing the record on remand, checking initial findings of fact, and making corrections if needed.  *Maldonado v. Astrue*, No. SA-08-cv-0503-NN, 2009 WL 398748, at *4 (S.D. Tex. Feb. 18, 2009); *Houston*, 895 F.2d at 1015.  Further, upon remand, "an ALJ shall take any action that is ordered by the Appeals Council and may make any determination that is not inconsistent with the remand order."  *Valek v. Shalala*, 56 F.3d 1385, 1995 WL 337760, at *2 (5th Cir. 1995)(citing *Houston*, 895 F.2d at 1015 and 20 C.F.R. § 404.977(b)).

As noted, during the first hearing, the VE classified Plaintiff's past relevant work as a bricklayer, masonry (DOT 869.664-014); construction masonry supervisor (DOT 860.137-010); and union representative (DOT 187.167-018).  (R. at 80.)  The first VE found that with an RFC for both light and sedentary work, a hypothetical person with Plaintiff's age, education, and work background could perform the union representative position.  (R. at 82.)  At the second hearing, the VE classified Plaintiff's past relevant work as a mason (DOT 861.381-026); membership solicitor (DOT 293.357-022); and business representative, labor union (DOT 187.167-018).  (R. at 124.)  She then clarified that Plaintiff would probably come closer to the semi-skilled level for the business representative position because he only performed the job for one and a half years.  (*Id.*)  The second VE found that with an RFC for light work, a hypothetical person with Plaintiff's age, education, and work

34

background could perform the membership solicitor position.  (R. at 126.)  Such a person could also perform the business representative position, but not at the skilled level.  (*Id*.)  In its order remanding the case to the ALJ, the Appeals Council found that the union representative position was not valid past relevant work for Plaintiff and ordered the ALJ to, among other things, obtain supplemental evidence from a VE.  (R. at 147-148.)

Plaintiff argues that the first VE characterized Plaintiff's job from 1999 to 2004 as a construction masonry supervisor while the second VE characterized that same job as a membership solicitor.  (doc. 12 at 18.)  He contends that because the requirements of the construction masonry supervisor position appear to exceed the RFC the ALJ issued in his decision, the decision would have been different had the ALJ adopted the first VE's characterization of Plaintiff's past relevant work rather than the second VE's characterization.  (*Id*.)  Because the first VE found Plaintiff capable of performing only the union representative job, which the Appeals Council found was not valid past relevant work for Plaintiff, the ALJ would have had to proceed to step five of the sequential analysis and find Plaintiff disabled.  (*Id*.)

Here, to the extent Plaintiff contends that the ALJ was not entitled to elicit additional VE testimony regarding Plaintiff's past relevant work, the order required that he obtain supplemental evidence from a VE, offer Plaintiff an opportunity for a new hearing, and issue a new decision.  (*See* R. at 148.)  It also provided that the ALJ take any further action needed to complete the administrative record.  (*See id*.)  Accordingly, the ALJ acted consistently with the Appeals Council's order in eliciting testimony from the second VE regarding Plaintiff's past relevant work.  *See Valek*, 56 F.3d at 1995 (finding the ALJ was not limited upon remand to only those issues noted by the Appeals Council, and the remand order was unlimited in scope where it sent the case back to the ALJ

"for further proceedings, including a new decision."); *Parms*, 2015 WL 5176860, at *6 (finding the remand order was not limited in scope where the ALJ was free to do "anything else needed to complete the claim").

Additionally, both VEs reviewed the record and considered Plaintiff's testimony at their respective hearings, and they identified certain occupations that encompassed his past relevant work. (*See* R. at 80; 122-125.)  Despite the fact that each VE identified 3 different jobs as Plaintiff's past relevant work, there is no indication from their testimony or Plaintiff's testimony that they assigned different DOT occupations to Plaintiff's work from 1999 until 2004.  As the Commissioner points out, both the construction masonry supervisor and membership solicitor jobs involve different requirements and skills and therefore would appear to be assigned to different positions held by Plaintiff.[6]  The record suggests that the first VE characterized Plaintiff's work from 1999 until 2004 as a business representative, and the second VE characterized Plaintiff's work during that time period as a membership solicitor.  According to Plaintiff's testimony at both hearings and his work history report, he was a masonry foreman from about 2005 until 2009.  (*See* R. at 56-58, 122-23, 302.) Plaintiff testified at the second hearing that from 1999 until 2005 he was an agent organizer that went out and recruited people to be in the union, and from about 2003 until 2005, he was

---

[6]According to the DOT, the job duties associated with DOT # 860.137-010 are: Supervises and coordinates activities of workers engaged in supplying materials to workers who construct, erect, install, and repair wooden structures and fixtures. Directs work crew to strip forms and dismantle temporary wooden structures. May supervise workers engaged in pouring concrete into wooden forms. Performs other duties as described under SUPERVISOR (any industry) Master Title.  Dept. of Labor, Dictionary of Occupational Titles, #860.137-010 (4th ed. 1991).

The job duties associated with DOT # 293.357-022 are: Solicits membership for club or trade association: Visits or contacts prospective members to explain benefits and costs of membership and to describe organization and objectives of club or association. May collect dues and payments for publications from members. May solicit funds for club or association [FUND RAISER (nonprofit org.) II]. May speak to members at meetings about services available. *Id*. at #293.357-022.

treasurer/president of the union. (R. at 122.) He also testified at that hearing that he was a working mason during the time he was a masonry foreman. (R. at 123.) The first VE's finding that Plaintiff was a construction masonry supervisor appears to refer to his position as a masonry foreman from 2005 until 2009. (*See* R. at 73-74.) Her finding that Plaintiff was a union representative appears to refer to his position from 1999 to 2004. Plaintiff's testimony of his work from 1999 until 2005 aligns with the membership solicitor position found by the second VE. Given Plaintiff's testimony that he was working as a mason while he was a foreman, the second VE appears to have characterized both his positions as a mason brick layer (from pre-1999) and a masonry foreman (from 2005 to 2009) as that of a mason. The record simply does not indicate that the VEs assigned different DOT job positions Plaintiff's work from 1999 until 2004.

In any event, the ALJ was not required to resolve any conflict between the testimonies of the two VEs, whether they assigned different DOT positions to Plaintiff's work from 1999 until 2004 or not. The ALJ was not bound by his earlier decision in this case, and he had the authority on remand to reevaluate the facts. *See Houston*, 895 F.2d at 1015. Although he was required to resolve the conflict between the occupational evidence provided by the VE and information in the DOT and SCO, which he did (*see* R. at 33), there is no requirement that he resolve any conflict between the two VEs' testimony. (*See* R. at 148.)

Additionally, Plaintiff's attorney did not raise the issue of a conflict in the VEs' past relevant work before the ALJ at the second hearing. Plaintiff may not now present the conflict as reversible error when he failed to raise it at the hearing. *See Parms*, 2015 WL 5176860, at *7 (holding "the Court will not now allow Plaintiff to present [the conflict between the VEs' classification of his past relevant work] as reversible error when it "was not deemed sufficient to merit adversarial

development during the administrative hearing.'" )(citing *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000)).

Notably, Plaintiff's testimony at the second hearing supports the second VE's finding that Plaintiff did perform the duties of a membership solicitor.  Plaintiff testified at the second hearing that he went out and recruited employers and masons to be in the union.  (*See* R. at 122.)  These duties are consistent with those of a membership solicitor according to the DOT.  The ALJ did not err by accepting the second VE's classification of Plaintiff's past relevant work or by not reconciling any conflict in the VEs' classification of Plaintiff's past relevant work.  *See Parms*, 2015 WL 5176860, at *7.

Plaintiff failed to establish that remand is required on this issue.

**D.      Medical Opinion Evidence**

Plaintiff next contends that the ALJ erred by discounting the limitations that Dr. Chowdhry reported and instead assigning significant weight to non-examining medical consultant Dr. Murphy without conducting the required analysis set forth in 20 C.F.R. § 404.1527(c).  (doc. 12 at 20.)

The Commissioner is entrusted to make determinations regarding disability, including evaluating medical opinions and weighing inconsistent evidence.  20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)

is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the

medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.  "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted)  Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, the ALJ determined that Plaintiff had the physical RFC to perform light work as defined

in 20 C.F.R. § 404.1567(b).  (R. at 19.)  In assessing Plaintiff's RFC during the period at issue, the ALJ stated that he considered the evidence of record.  (R. at 19.)  He outlined in great depth Plaintiff's visits to his treating doctors, including Dr. Chowdhry, noting the doctors' diagnoses and notes as well as Plaintiff's complaints.  (R. at 18-32.)

The ALJ also took into account Plaintiff's testimony regarding his symptoms and the extent to which they affected his functioning.  (R. at 20, 30-31.)  After careful consideration of the evidence, however, he determined that they were not credible.  (R. at 30-31.)  He found that although Plaintiff alleged significant limitations since his alleged onset date, his documented statements to his doctors were more credible than allegations he made during the disability process. (R. at 30.)  He noted that Plaintiff regularly exercised by walking since his alleged onset date, and that Dr. Dimmitt recommended that he get 30 to 45 minutes of exercise daily for 5 days a week.  (*Id*.)  The ALJ also pointed out that Plaintiff told his doctors that he was driving a tractor, lifting bales of hay, and engaging in other heavy and substantial work while working as a farmer.  (*Id*.)  He assigned greater weight to those statements made to the doctors than to Plaintiff's testimony that he relied substantially on others to perform that work.  (*Id*.)  Further, the ALJ noted that Plaintiff's treatment significantly improved his conditions to the point where he was able to perform his manual labor.  (R. at 30-31.)  The medicine for his EF improved it to normal levels; an ablation improved his atrial flutter symptoms, including fatigue and palpitations; injections in his hands and shoulders resolved pain in those areas, allowing him to work on his farm; and his left shoulder regained essentially all its range of motion and strength following his left shoulder surgery.  (R. at 31.)  The ALJ additionally considered that the record indicated Plaintiff had not been consistently medically compliant and failed to wear his prescribed CPAP machine to treat his obstructive sleep apnea.  (*Id*.)  Also, Plaintiff told

41

his provider that he received unemployment benefits after his alleged onset date.  (*Id*.)  In order to be eligible to receive unemployment benefits, one must be both able and eligible to work, and therefore the ALJ found that Plaintiff must have represented that he was able and available to work after his alleged onset date.  (*Id*.)

In making his assessment, the ALJ also took into account and considered the assessments and opinions of Dr. Chowdhry, Plaintiff's treating physican, as well as the opinions of Dr. Rowlands, Dr. Reid, and Dr. Murphy.  (*Id*.)  He assigned significant but not great weight to Dr. Murphy's opinion because it was largely consistent with the medical evidence of record and objective findings.  (*Id*.) He similarly gave significant weight to Dr. Rowland's and Dr. Reid's opinions, finding their opinions to be largely consistent with the record overall, particularly with respect to their lifting, carrying, standing, and walking limitations.  (*Id*.)

The ALJ assigned little weight to Dr. Chowdhry's April 14, 2014 opinion because he found that its extensive limitations were not supported by the objective medical evidence of record, including Dr. Chowdhry's own treating source records.  (R. at 32.)  He determined that Dr. Chowdhry's assessment appeared largely based on Plaintiff's subjective allegations made during his visits.  (*Id.*)  He considered that in November 2013, Dr. Chowdhry only noted a single abnormality of Plaintiff's left arm being in a sling due to his shoulder surgery, and there were no signs of joint synovitis, tender points, decreased range of motion, or other objective abnormalities.  (*Id*.)   In December 2013, Dr. Chowdhry noted that there was no clubbing, cyanosis, or edema in his extremities, his back had no tenderness, and he exhibited normal range of motion in all his joints without synovitis.  (*Id*.)  The ALJ pointed out that these findings were consistent with Dr. Krishnan's findings in December 2013 that Plaintiff had excellent range of motion in his shoulder and his

surgery wounds were well-healed.  (*Id.*)  The ALJ noted that Plaintiff's activity in the record, i.e., regularly walking for exercise and working on a farm for significant periods of time following his alleged onset date, did not support Dr. Chowdhry's extensive limitations.  (*Id.*)  The ALJ also found that there was no evidence of ongoing issues with anxiety and no more than an acute mention of it in the record.  (*Id.*)

The ALJ also assigned minimal weight to Dr. Chowdhry's June 28, 2013 assessment.  (*Id.*)  It was superseded by his April 14, 2014 opinion, as it contradicted the extreme limits Dr. Chowdhry found at that time, and it was not supported by the objective findings of record.  (*Id.*)  The ALJ noted that Dr. Chowdhry limited Plaintiff's sitting, standing and walking to include a requirement that he lie down for 5 hours, but his treating notes from that day indicate no cyanosis, clubbing, or edema in his extremities, no neurological deficits, no back tenderness, and a normal range of motion in his joints.  (*Id.*)  He also found that there was no objective evidence of any limitations that would prevent Plaintiff from standing, walking, or sitting.  (*Id.*)  Although he had marked tenderness in his first left CMC joints and diminished range of motion in his left shoulder, those symptoms were not consistent and did not occur on a continuing basis, especially after he had his left shoulder surgery.  (*Id.*)  Finally, the ALJ noted that Plaintiff never gave any indication that he could not concentrate due to his pain.  (*Id.*)

Because there was no medical evidence from a treating or examining source controverting Dr. Chowdhry's assessments, the ALJ was required to perform the six-factor analysis set forth in  20 C.F.R. § 404.1527(c)(1)-(6) before dismissing Dr. Chowdhry's assessments.  *See Newton*, 209 F.3d at 453-55.  Although the ALJ did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 404.1527(c)(1), he specifically stated that he considered opinion evidence in accordance

with the requirements of 20 C.F.R. §§ 404.1527 and 416.927. (*See* R. at 19.)  His decision reflects that he did consider the factors, as he reviewed Dr. Chowdhry's opinions (and the opinions of the other doctors) and considered whether they were consistent with his treatment notes and the record as a whole, he considered the medical signs and laboratory findings supporting each opinion, and he considered whether each source examined or treated Plaintiff.  (*See* R. at 19-32.)  The regulations require only that the Commissioner "apply the factors and articulate good cause for the weight assigned to the treating source opinion." *See* 20 C.F.R. § 404.1527(c)(2); *Brewer v. Colvin*, No. 3:11-cv-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *rec. adopted*, 2013 WL 1949858 (N.D.Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-cv-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010).  "The ALJ need not recite each factor as a litany in every case." *Brewer*, 2013 WL 1949842, at *6.

Here, the ALJ's decision reflects that he properly weighed all the evidence, and his narrative discussion showed that he thoroughly analyzed and took into account the treatment notes during the relevant period, the assessments made by the non-examining and non-treating doctors, and Plaintiff's testimony at the hearings before the ALJ.  (*See* R. at 19-32.)  The ALJ's contention that Dr. Chowdhry's opinions were not supported by the objective medical evidence of record combined with his thorough review and analysis of the objective record satisfy his duty under the regulations and and constitute "good cause" for affording little or no weight to those statements in his RFC determination.  *See Brewer*, 2013 WL 1949842, at *6 (finding the ALJ's explanation as to why he did not give controlling weight to a treating physician's opinion constituted "good cause" even though he did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 1527 (c)(2)); *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*, No. 3:09-cv-2094-BD, 2011 WL

44

1107205, at *6 (N.D. Tex. March 25, 2011) (same); *Gomez v. Barnhart,* No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D.Tex. Nov. 5, 2004) (finding the ALJ complies with regulations if the resulting decision reflects that consideration was given to medical consultant's opinion); *see also Hall v. Astrue,* No. 3:11-cv-1713-BH, 2011 WL 1042285, at * 9 (N.D. Tex. March 21, 2011)(finding "[c]ourts have ... relied on medical records noting an improvement with medication to find that the ALJ properly assigned little or no weight to a treating physician's opinions.")(citing *Zimmerman v. Astrue*, 288 F.App'x 931, 935-36 (5th Cir. 2008)).

Accordingly, Plaintiff has failed to establish that remand is required on this issue.

### III.  RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 26th day of February, 2016.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

45

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

  A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

46